Okay, we're back with apologies for the delay for the last case on the calendar this morning, which is Johnson v. Couturier. Do I pronounce it correctly? Couturier. If counsel are ready, if they'd come forward, please. Judge Hugg, can you see us all right? I can. Okay. Now, you've got a little different situation here, two of us up here. And Judge Hugg will speak up if he's got a question, and if he does, just turn to him and listen to it and respond to it. Thank you, Your Honor. Counsel, go right ahead. May it please the Court, I am Theodore Becker, and this morning I'm arguing on behalf of all the appellants, the individual defendants. I would like to reserve five minutes for rebuttal, if possible. Sure. So does that include Mr. Eddy? That does, Your Honor. Okay. Even though he didn't file any briefs. Mr. Eddy adopted Mr. Johanson's briefs. These appeals present important issues that transcend this case. First, by denying corporate employees and agents the opportunity to have litigation costs advanced by their corporate principles pursuant to promises made before any litigation materialized, the district court's decision undermines established principles of state corporation law, and with it discourages individuals from entering into corporate or fiduciary service they can ill afford standing by themselves. Well, Mr. Becker, we've got a policy of the law that permits indemnification, but the real question here is advancement of fees and undertaking, correct? That's absolutely correct. So a corporation could indemnify its officers and directors, but for reasons, in this case, perhaps, of preemption by Federal law, refuse to advance costs, reserving the right to pay them later if it's ultimately determined that they're entitled to indemnification, is that correct? That's correct, although I disagree that it's preempted by Federal law, Your Honor. I understand that. Okay. I think there's a real distinction, though, between advancement rights and indemnification rights, and reimbursement is not the same at the end of a very costly and almost a litigation that some of these defendants may not be able ultimately to afford to. Well, let's talk about Mr. Couturier because he's sort of your hardest case. I mean, he got $34.8 million, and now he's saying that he can't afford legal fees. What happened to the money? No, he's not saying he can't afford the legal fees, Your Honor. But all of his legal fees are in retirement plans. That was the way they were paid to him through the company. And so every dollar that he spends in legal fees is costing him $1.40 because he has to pay the taxes and penalties when he withdraws it from the retirement fund. That money, the $0.40 per dollar, is not recoverable to Mr. Couturier, and that's the real problem. Well, I think you might be right, but I've never seen any case law on that. That's an interesting twist on indemnification. If I were representing Mr. Couturier, I would certainly be arguing to the corporation that that was part and parcel of my costs of defense. I just don't know if there's any case law. I don't think there is. But in any event, Mr. Couturier has four contracts, three of which are in his capacity as director and officer back in 2001, and he took the position with the company of president and CEO and then with the trustee of becoming the trustee of the ESOP with the expectation that if he is sued, because it only takes one participant to sue anyone, a director, officer, or a fiduciary, whether their claims have merit or not. Okay, but he's not taking the position which, frankly, I thought he was taking in your briefing, that he is financially unable to afford the costs of legal representation. No. He has to liquidate his investments. He has to pay the 40 cents extra for every dollar. We think that's substantial prejudice that's outside of his contract and both his state and our risks of rights. Part of what he received was the Bentley, was it not? $200,000 Bentley? I'm sorry. Part of what he received was a $200,000 Bentley. Yes, I know the plaintiffs are fond of making that case, but of course, Your Honor, we all know that's not what the case is about. All the corporate officers of the executive, prior to Mr. Caturia taking over the realm, the reign of the small company, go to large Mercedes Benz. Yeah, I'm sorry. I just wanted to get to the point that he's too poor that he can't pay these expenses, and he's got that. He has the home in Palm Desert that was received as a part of this. So I have an awfully hard time seeing why he is so handicapped in paying the expenses. Well, Your Honor, we're not saying he can't pay the expenses. What we're saying is he has contract rights and statutory rights, and he shouldn't have to, and he is incurring substantial prejudice by doing so. And, of course, both the car, which is an appreciating asset, and the Palm Desert home are illiquid assets, and his investments are in retirement funds. So he's not here crying poor. I don't want to mislead the court. But he also created large values for his company. The assets were sold for $63 million, Your Honor. And so I don't think just because he's been sued, he should be deprived of his contractual and statutory rights to have his legal fees paid. Mr. Becker, could you, hearing that argument, how can you help us with the fact that if we grant you the relief that you're asking for, the money is essentially going to come out of the pockets of the beneficiaries of the ESOP, and at the rate you all are burning up legal fees, and I've been involved in my prior life in defending these kinds of cases. I know how expensive they can be for everybody involved. But as the practicality here is, by the time the government's done with its investigations and all the suits are over, there won't be any money left for the beneficiaries. Well, that's, of course, not necessarily the fault of the defendants. They've been sued, and we don't think the claims have any merit, Your Honor. The fact is that it's no different in this case than under corporate law. A corporation has obligations it must discharge. Just because this corporation has had its assets sold and is in liquidation doesn't mean that it doesn't have to first discharge its obligations to creditors. But would you agree that most of the cases that we have on the books dealing with indemnification deal with ongoing corporations and the question of whether or not it's proper to use the assets of the corporation in order to indemnify their top management? Yes. And I think that this is that's a distinction, not a difference, Your Honor. This company could go back in operation tomorrow if the corporate director decided that it wanted to acquire a new company and do so. And if we're going to have shareholders ---- But it would be hard to do if you've only got $10 million after the company was sold for $63 million. Well, when Mr. Couturier took over the company, it had a negative cash flow, a negative cash position of about $5 million, and he built it up to $63 million in less than six years. I'm not saying the company will go into business, but I'm using that as an example, Your Honor, to show that corporate law should not be bent or there should be no difference between the way corporate law works for an operating company and the way it works for a nonoperating company. As a matter of fact, the plan of liquidation calls for the discharge of contractual and other obligations, and so does the corporate law. I would also be remiss if I didn't point out, Your Honor, that under the Federal Arbitration Act, there's already been a binding arbitration award. Well, except that the ESOP wasn't a party to that arbitration, were they? ESOP is a shareholder, Your Honor. And the company is a party ---- Who were the parties in the arbitration? The company, TEOC, Employee Ownership Holding Company, defended. And then the two, Mr. Eddy and Mr. Johanson, brought the arbitration. And actually, as a matter of fact, the company ---- But aren't the plaintiffs in the case before Judge Beislein the actual beneficiaries of the plan? Actually, they're participants in the ESOP plan. The ESOP is the shareholder. The arbitrator ruled. Ironically, the company asked the arbitrator to allow the ESOP and to allow the participants and to allow the DOL to intervene in the arbitration. The arbitrator quite properly read the arbitration agreement and saw that the only parties were the individuals and the company. If we were to say that the ---- that all these other people should be in the arbitration, why wouldn't that be the case for every corporation that enters into an arbitration agreement? I think that was proper. And under Section 9, the Federal Arbitration Act, if any of these people had a problem with the arbitrator's ruling, their recourse was not to go to Judge Beislein. Their recourse was to go in the northern district of California pursuant to Section 9 of the Federal Arbitration Act within 120 days and file a motion to vacate the arbitration agreement. In the normal course, I would agree, but we have this overlay of ERISA that we have to deal with and the question of fiduciary obligations that are owed to these beneficiaries. The fiduciaries apparently tried to intervene, but the arbitrator refused to permit them to do so. The district court was moved by the fact that the beneficiaries would be left with virtually nothing if it did not grant injunctive relief. And the question is whether the district court abused its discretion in granting the relief that it did for that reason. Well, I think the district court did abuse its discretion, Your Honor, but I don't think you have to go that far because I think that as a matter of law, it was just a clear error of law to disregard the Federal Arbitration Act entirely and grant what basically is a plenary review. The district court said that the parties who arbitrated could not enforce the award even though the district court also found that the award was binding on the company. And that's clearly an inconsistent finding. In addition, the district court entered an unprecedented freeze on Mr. Gutierrez's assets. It's an extraordinary order, and it's based on a determination that that ---- How is that any different, though, from cases where we freeze the assets of the defendant in a case where there has been serious wrongdoing? Let's say the corporation's assets have been looted through fraud or some sort of illegal act, and there may well be a restitution order entered at the end of the civil or criminal case, and so we freeze the assets of the wrongdoer in order to restore the victims to what they lost. Well, it's different because there's no finding of fraud. There's no real evidence of fraud or any criminal wrongdoing whatsoever. And it's also ---- there was a finding that it was ---- that it did not harm Mr. Gutierrez. Now, in these turbulent times, to freeze all of his assets and investments clearly did harm and, by the way, in fact did harm Mr. Gutierrez in the ensuing months. With the Court's permission, I'd like to reserve the remaining of my time for rebuttal. Of course you can. Thank you for your argument. You have a little over three minutes. Thank you. Okay. Now, there's a division of argument on this side, right? Yes. I'm arguing for the Secretary of Labor, as amicus curiae, on five minutes of seated time. Can you put five on the clock, please? Okay. My name is Elizabeth Hopkins, and may it please the Court. The defendants in this case seek to require that the remaining assets of this now-defunct company be used to advance some of their defense costs in a case where they're being sued for breaching their fiduciary duties to the ESOP pension plan by misappropriating upwards of 75 percent of the value of the company to the great detriment of the ESOP. And I think three things are really worth noting in this regard. First of all, the company is completely owned, 100 percent owned by the ESOP. Second, as the Court has recognized, the company is now, has now been liquidated, and under the plan of liquidation, the remaining assets of the company will be paid to the plan participants as the sole shareholders unless these indemnification agreements are enforced. And third, the agreements purport to cover not only the defense costs in this case, but also to pay for any liability on the part of the defendants subject only to certain State law limitations. Ms. Hopkins, I don't think there's any question in anybody's mind that if the injunction is lifted and the indemnification undertakings are enforced, there isn't going to be anything left by the time this is all over. I think that's probably right. But Mr. Becker's point is a good one. I mean, at this point, it's all allegations. There hasn't been a judgment entered against Mr. Couturier. The district court was obviously moved by the evidence that you presented in hasty fashion in order to obtain the preliminary relief. But that's still not a judgment that we should be freezing everybody's assets on. Well, with regard to the $15 million remaining in company assets. Is it $15 or $10? It's $15 million at this point. I think that's right. I think $5 million have been paid out to the plan participants, and there's still $15 million left. Well, I thought it was $15 and $5 had been paid out, and $10 is not at all. I may have my numbers wrong, but I think that that's, I think I'm correct on that. But, you know, I would say this. If you could deplete that money and completely pay it out and leave essentially the ESOP and its participants with nothing at the end of the day, that would be a really surprising result under ERISA, even if there weren't an anti-exculpatory provision, but ERISA does have an anti-exculpatory provision, section 410, which is meant to very broadly protect ERISA plans and their participants, and it does this by providing that any provision in an agreement that purports to relieve a fiduciary of liability or responsibility for breaching any of their duties is void against public policy. I mean, it pretty clearly spells out what the public policy is here. And given that express language, the advancement of attorneys' fees that they, that the defendants seek here is impermissible under ERISA. So this does seem kind of counterintuitive to argue on the one hand that the indemnification should be blocked, but on the other hand, to argue that the individual has plenty of assets to pay for attorneys' fees and then to freeze assets. What's your response? We actually did not address in our amicus brief the freezing of Mr. Coturier's assets. Should I address that to you? I think that probably makes more sense. That's fine. You know, and in fact, the district court here said, you know, said that one of the reasons not that, you know, that an injunction here was proper as to the remaining assets in the company was because even with regard to the undertakings that the defendant signed here, there was really no, you know, there was sort of an inconsistency with saying we really need the money now in order to pay our attorneys' fees, yet just, you know, trust us that we'll be able to repay the money at the end of the day. And the Court was concerned with that. I also would stress here that, you know, something that I think is really important about the injunction itself, which is that it simply preserves the status quo ante. It puts the remaining assets of the company in escrow so that if it turns out at the end of the day, you know, the defendants are able to show that they lived up to their duties as fiduciaries, that money is still there. And this, you know, given this fact especially, I think, you know, I think because of 410 alone and the express language of 410 alone, the injunction, the district court correctly enjoined the indemnification. But that's cold comfort. That is cold comfort to these defendants who in the meantime are going to have to incur hundreds of thousands, if not millions of dollars in defense costs. And what happens if they win at the end of the day? They're entitled to indemnification if you can't show that they've reached their fiduciary duties. And yet you have essentially taken away their right to hire counsel to help establish that by freezing these assets. Well, between, you know, the plan and the plan participants. Excuse me. Doesn't the injunction that was entered, freezing assets, accepts legal fees? And that is legal fees are allowed out of the frozen assets. That's correct. In that order, I think Mr. Couturier is allowed to pay his attorney fees out of his – out of those assets. As I understood, part of the argument about those assets is they're illiquid, there's a penalty for using them. But I don't think they're completely – I don't think they're at all unavailable for the payment of attorney's fees. That's correct. Really, and the fact that these indemnification are State law contracts and that there's generally the State law policy, you know, in favor of honoring contractual and indemnification agreements is really, I think, irrelevant and a red herring given the fact that 410 is directed at any provision that relieves fiduciaries of their obligations or liability, and because ERISA spells out what the public policy is in this situation. If Boyd's is against public policy, these kinds of arrangements. Thank you for your argument. I appreciate you coming in. I appreciate you coming in. Counsel? Greenwald? Good morning, Your Honors. May it please the Court, I'm Gary Greenwald, and I am here today on behalf of the appellees. This is and always has been a very simple but classic case of overwhelming greed and self-dealing by ESOP fiduciaries. The facts were straightforward as presented to Judge Beislein, and in fact, contrary to the argument of the defense counsel here or appellate's counsel, there was vivid detail and substantial evidence that was presented to Judge Beislein in connection with preliminary injunction number one as well as preliminary injunction number two that provided the factual support for the findings that the Court made. Applying the abuse of discretion standard, it is clear that Judge Beislein applied the applicable standards here in the Ninth Circuit, applicable case precedent under ERISA, and made factual findings that were supported by the record. Now, the defendants in this case have painted a picture of a district court that ignored compelling State law public policies, those policies relating to the indemnity contracts. However, it is the defendants, in this case the appellants, that have ignored a compelling, overriding Federal public policy that derives from ERISA. Those policies form the framework of the district court's decision, and they override or trump the interests of State law policies. Now, that is set forth in 29 U.S.C. section 1001, in which a statute in which the Congress has indicated that benefit plans have huge economic impact upon interstate commerce, that benefit plans are affected with a national public interest, and that it is the declared policy of the Federal Government that safeguards must be provided with respect to the establishment, operation, and administration of benefit plans. It was for that reason. But Congress did recognize, Mr. Greenwald, that corporations may properly use assets to pay the premiums for director and officer liability policies that normally cover these kinds of cases. And, in fact, such insurance was procured here, was it not? Well, that's true. And if we were talking only about insurance, that would be one thing. But insurance is a risk-sharing arrangement where the insurance company and the company or the plan shares part of that risk. Here, once the insurance ran out, there's only one person that's going to be sharing the risk, and that's the plan. Every dollar that is paid out in legal fees is one less dollar for this liquidated company and its sole shareholder. But that is true in the non-ERISA situation, isn't it, where a corporation procures D&O coverage, the policy benefits are exhausted, but the defense costs continue and there's an indemnification and an advancement obligation. The corporation then has to reach into whatever other assets it has in order to satisfy that obligation. I agree with Your Honor, but there is a huge difference between a factual setting brought under ERISA and a factual setting brought on a purely state law claim. Under ERISA, the whole reason for establishing this very important law, which has been in effect since the 1970s, is to protect against corruption by fiduciaries. The very thing that is at issue here, if we were to allow these fiduciaries to benefit by having their expenses paid and not have any safeguards in place for repayment to the plan so that the plan could be made whole, we have defeated, we have eviscerated ERISA. We have completely ruined an important statutory framework that our Congress put into place to protect a national public interest. Suppose Mr. Couturier came back with an offer of security to secure the undertaking that he has signed. Would that satisfy the concern that you're worried about? I think it could if it is, if it satisfies the, in this case, the court, that the ESOP would be repaid. Our case comes on very fact-specific circumstances. First, it comes on the fact that we have a contract that violates Section 410 because it shifts responsibility and liability other than insurance. But secondly, and most importantly, it comes under an application of 410 where there is no basis for the directors having determined that there is a likelihood of repayment. And in fact, if we go back to 1977, Your Honor, right after ERISA was adopted, the Department of Labor, the organization responsible for administering that plan and establishing regulations, they themselves at that time put forth an advisory opinion that made it clear that one of the elements of indemnification, which is recognizable and which will be proper and advancement is proper, but one of the requirements is that the fiduciaries provide substantial evidence of either a secured undertaking or that they have the ability to make the plan whole. That's a critical ingredient of ERISA. We don't have it here, and the judge recognizes it. But I'm guessing if Mr. Coturier offered to secure his obligation with the assets that are now held in his retirement plan that you would object to the use of those assets on the theory that they are ill-gotten gains. That is correct. So is this sort of a constructive trust theory that you're entitled to a lien in advance of judgment on those claims? Well, we're not asking for a lien in advance of judgment, but we have asserted a constructive trust claim. And under the equitable power of the court, the court does have the right to ensure that any final relief that is granted is effectual. The defendants have tried to make it seem as though this is a radical change in the law. This really isn't. The principles for indemnity and advancement that the Department of Labor set forth in their advisory opinion in 1977 are set forth in that decision. They are the same thing. And the court has applied the proper Ninth Circuit criteria for finding injunctive relief. Mr. Greenwald, what's your response to 29 CFR Section 25.3-101H3, which, as I read it, seems to say that where a plan owns all of its employer's shares, then the plan assets do not include underlying employer assets? Well, my response to that is that that is an administrative interpretation of the plan, but it's not relevant to this case. What is important in this case, and I assume the court is looking at the authority of Cunningham because that's what it issued here, the court really didn't decide that issue. The court didn't have to, because under Section 410, there is no requirement in 410 that plan assets are impaired for there to be relief. More importantly, because of Section 406 of ERISA, there wouldn't be any reason for the prohibited transaction statutes if 410 only applied in the circumstance of an impairment. So it really doesn't apply to this problem. Your Honors, I only have a few minutes left, but the defendants have also tried to convince the Court that absent reversal of preliminary injunction one, there will be a chilling effect, a chilling effect upon the willingness of qualified fiduciaries or individuals or institutions to serve as fiduciaries or directors. This portrayal is wholly inaccurate. First of all, defendant self-dealing here, a gross misappropriation of more than 75 percent of the equity of a 100 percent ESOP-owned company stands on its own as sui generis. Those facts are highly unique and outrageous, and it is impossible to conceive that an independent institution serving as a fiduciary would engage in that kind of wrongdoing. Nor would a qualified institution serving as a fiduciary like Great Bank Trust or Reliance Trust who submitted amicus curiae briefs, nor would they be in a position where they didn't either have insurance to cover them or sufficient assets to provide either a secured undertaking or to show their creditworthiness to repay the indemnity or advancement. So the situation that is described to you as a chilling effect doesn't really exist. However, let me say this. If any corporate director or any independent fiduciary chooses to engage in the kind of self-dealing that went on here, Your Honors, then any chilling effect upon such person serving is both necessary and is absolutely mandated by ERISA. We can't allow this conduct, as Your Honor indicated in an earlier argument, if you allow this kind of conduct to be condoned and to continue, it will have an impact upon the commerce of this United States. ERISA was created for a reason. It was created to ensure that fiduciary conduct would not occur and that plans could be made whole when this kind of activity occurred. I think you mean misconduct. Pardon? You said conduct. I think you mean misconduct. Misconduct, yes, sir. Okay. So the court below simply applied ERISA in the proper manner to assure that when this case is over, if the defendant should prevail, they have the ability to be repaid, which, by the way, is around $12 million that is left, and that if they lose, then there is no loss to the ESOP. The ESOP can be made whole, at least to the extent of the constructive trust assets that still exist. Okay. I thank you. Thank you for your argument. Rebuttal? Mr. Becker? Thank you, Your Honor. First of all, there's an excess of $15 million left. There's an escrow that will be paid by Gibraltar mostly in full. Second, Ms. Hopkins from the DOL said that ERISA 410 voids the advancement agreements and demification agreements. This is what the DOL says, however, in its interpretive bulletin 75-4 that was issued the year after ERISA was enacted and has been in effect for the 30 years since. Quote, Indemnification provisions which leave the fiduciary fully responsible but merely permit another party to satisfy any liability incurred by the fiduciary in the same manner as insurance are not void under section 410. So what the DOL is doing is they're urging the Court to adopt a very, very special rule which has no basis whatsoever in this record or in the law. The rule is if it's 100 percent of the company is owned by the ESOP, then 410 does not – then 410 prohibits indemnification advancement. What is the rule if it's 99 percent owned by the ESOP or 51 percent owned by the ESOP? It's an unworkable rule. The next thing they're saying is if the company is not operating but in liquidation, then – and it's 100 percent owned, then 410 is not – prohibits it. Otherwise, it's perfectly fine on a nonrecourse basis for the company, not the plan, to indemnify and advance legal fees to fiduciaries and also to allow insurance to be provided on a nonrecourse basis. It's just unprecedented, and it's a slippery slope. As far as the chilling effect goes, five of the largest national independent institutional trustees decided it was important enough to file an amicus brief. So I don't think the Plaintiff's counsel can simply dismiss this. This is a very important issue. And if you hear what the Plaintiff's counsel said, he said, well, they can provide a security. They can't – they'll have the money. But again, that ignores the fact that under the law, under ERISA itself and State law, these indemnification advancement agreements are valid, and these trustees are entitled to rely on this as a matter of contract. If they serve at all, I can guarantee, Your Honor, that the fees will go sky high. And that will defeat the purpose of trying to get independent and nonconflictive trustees in the first place, although Congress, because many of these ESF companies are small companies, has permitted people to wear two hats, as has the Supreme Court. Johansson and Eddy, I might point out, there's been a lot of focus on Mr. Couturier, and they don't have nearly the assets Mr. Couturier has. While they do have assets, they are illiquid. Mr. Eddy has no counsel in this case, so I think that the Court doesn't have to speculate as to the harm that this tactical strategy is what we're really dealing with here. I mean, this would be a great rule for Plaintiff's lawyers, because all you have to do is have one participant sue a fiduciary, and then whatever allegations you make, because, as Judge Tallman, as you observed, these are all just allegations at this point in time, deprive all the fiduciaries of defenses and win the case. Because I know as a lawyer it's a lot easier to win an unopposed case than it is to win a case that's opposed. And we're very sorry this is costing a lot of money in defense costs, but we didn't sue. My client created value. Mr. Johanson is a lawyer who they keep saying is an ERISA fiduciary, but he only served as ESOP trustee for one day and he made no decisions. He's a lawyer. He was on the Board of Directors, as were Mr. Couturier and Mr. Eddy. Mr. Eddy came to this situation with no prior relationship. But I thought the Board of Directors did other things, like approved other benefits to Mr. Couturier that are at issue. Absolutely. And that's the whole essence of our case. That's why it's not an ERISA case at all. The Board of Directors approved all these compensation plans. And the interesting thing, which the plaintiffs are fond of ignoring, is that these were all approved by the outgoing independent Board of Directors in 2001. Mr. Couturier was on that board, but he was in a minority. Mr. Tom McIntosh, who had been the general counsel of the company for years, and Ms. Patricia Knoll, who was the founder's wife, were the ones who voted in favor of Mr. Couturier's compensation package. And they – and at that time, as part and parcel of the same corporate decision, the company sold 80 percent or 85 percent of its remaining – of the remaining stock of the shareholders to the ESOP. At that time, the ESOP had only 15 percent of the shares. So the very same transaction that gave the company – that gave the ESOP, rather, 100 percent of the shares, also gave Mr. Couturier his incentive package, which ultimately was monetized. And it was monetized by an independent special trustee, Mr. Eddy. He had no relationship with the company. He got paid a salary. The only reason he's not independent now, say the plaintiffs, is because they've sued him. So you can see how this strategy and this tactical program goes. Well, wasn't – wasn't Eddy – was he the former stockbroker or financial person who helped Mr. Couturier invest all the money? That was later, Your Honor. But at the time that he – But I – the plaintiff's theory is that he's not a completely independent outsider. They say that because he had an expectation of managing Mr. Couturier's money, which, by the way – That's the allegation. Which, by the way, he never did. They had – they had discussions about it. But, you know, there was no quid pro quo here. Alliance Capital Holdings, which is an independent company that acquires ESOPs, came to this company in 2003 and offered to buy it out and offered $27 million for Mr. Couturier's interest. Zenith Capital and another investor, Mr. Dan Mitells, did a calculation of Mr. Couturier's interest and calculated it at $34.4 million that fall. Mr. Couturier and the board turned down that offer, those two offers, because they felt they weren't fair to the ESOP, because they didn't create a floor for the ESOP participants, and because they were stock deals and the ESOP would have to rise or fall on the – on the future of Alliance Capital Holdings. And then the merger transaction in 2004 that created TIAC and took those benchmarks to monetize Mr. Couturier's buyout was approved by Moss Adams, which had done all the valuations on the ESOP. Well, I thought it was a – it was a – Moss Adams didn't give a clean opinion, did they? Well, the plaintiffs say that, but if you open up the end of the Moss Adams opinion, it says that it's fair to the ESOP and fair to the participants. And – You're way over your time. I'm sorry, Your Honor. Okay. Thank you very much for your attention. Thank you all. That's okay. Thank you both for your arguments. Very interesting case. It will be submitted for a decision, and the court will stand in recess for the day. Thank you, Judge Hugg. Thank you. This court will recess and stand adjourned. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor.
judges: Hawkins, Tallman, Singleton